# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 2:04-cv-0662-RLH-RJJ |
| vs. | **DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW, and JUDGMENT** |
| CYRIL A. OVUWORIE, M.D.; KAPPELLINI MEDICAL, INC.; & CYRIL A. OVUWORIE, M.D., P.C., | |
| Defendants. | |

This matter having come on for trial before the Court on November 13, 14, 20, and 21, 2006, the parties having appeared by and through their respective counsel, and the Court having heard the testimony of witnesses and having considered all exhibits accepted into evidence at trial, and the written closing, final and rebuttal arguments having been filed with the Court on January 16, February 1, and February 7, respectively, the Court now renders its Decision, Findings of Fact, Conclusions of Law, and Judgment, as follows:

## DECISION

The Plaintiff has failed to prove, by a preponderance of the evidence, that Defendants knowingly violated the False Claims Act (FCA) 31 U.S.C. §3729 *et seq.* or acted with deliberate ignorance or reckless disregard of the truth of his billings to Medicare for services provided to patients Hooker and Richmond. Therefore, the Plaintiff has failed to prove its case against the Defendants and the Court finds in favor of the Defendants.

FINDINGS OF FACT

1. Plaintiff, the United States of America, is acting on behalf of the Department of Health and Human Services (HHS). HHS is an agency and instrumentality of the United States, and its activities, operations, and contracts are paid from federal funds. At all times material to this action, HHS contracted with insurance carriers to administer Part B of the Medicare program within the State of Nevada.

2. Defendant Cyril A. Ovuworie, M.D. (Ovuworie) is a citizen and resident of the State of Nevada and is subject to the jurisdiction of this Court. At all times material to this action, Ovuworie was licensed to practice medicine in Nevada and was a participant in the Medicare program within the State of Nevada. At all times material to this action, Ovuworie practiced medicine under the business name Kappellini Medical, which was a business name used by Defendant Kappellini Medical, Inc.

3. Defendant Kappellini Medical, Inc. (Kappellini) is a corporation organized under the laws of the State of Nevada. At all times material to this action, Kappellini maintained its principal place of business at 2110 E. Flamingo Road, Las Vegas, Nevada, and did business under the name of Kappellini Medical. At all times material to this action, Ovuworie was a shareholder, manager, employee, and authorized agent of Kappellini.

4. Title XVIII of the Social Security Act, 42 U.S.C. §1395 *et seq.*, establishes the Health Insurance for the Aged and Disabled program, popularly known as Medicare.

5. Medicare is comprised of two principal parts. Part A of Medicare provides hospitalization insurance for eligible individuals. 42 U.S.C. §§1395C-1395i. Part B of Medicare is a voluntary subscription program of supplementary medical insurance covering items and services other than hospitalization, such as charges for medical care in physicians' offices. Persons with End State Renal Disease (ESRD) are eligible for coverage under Medicare Part B. The Part B program covers only those services and procedures which have been determined to be medically reasonable and necessary. 42 U.S.C. §§ 1395y(a)(1)(A). The Part B program requires beneficiaries to bear

1  some of the cost of their care to prevent over-utilization, and accordingly, part B generally covers
2  80% of the reasonable charges as established by a physician fee schedule, with the patient responsi-
3  ble for the remaining 20%.  42 U.S.C. § 1395(a)(1).
4  6.       Physicians and other health care providers who provide services to Medicare
5  beneficiaries submit a claim for reimbursement to the appropriate Medicare contractor using Form
6  HCFA 1500, either by mail or electronically, Each HCFA 1500 form details the provider's
7  identifying information, the date and type of service, procedure, or supplies provided, the diagnosis
8  of the patient, and the amount of reimbursement sought.  Providers who submit claims using Form
9  HCFA 1500 must affirmatively certify that the services described were actually performed by the
10 submitting provider and were medically indicated and necessary.
11 7.       Regulations adopted by the Center for Medicare and Medicaid Services (CMS), a
12 department of HHS, require that the description of a provider's services and procedures must be
13 entered onto Form HCFA 1500 using procedure codes established by the American Medical
14 Association, known as the Physicians' Current Procedural Terminology (CPT).
15 8.       At all times material to this action, physicians who performed services related to
16 outpatient renal dialysis for patients with ESRD were permitted by Medicare regulations to bill for
17 and receive for those services either a monthly capitation amount or, for parts of a month, a daily
18 capitation amount, which was set by the physician fee schedule.  The physician was permitted to bill
19 Medicare using CPT Codes 90918 through 90925, as appropriate, for those services, Physicians who
20 performed services related to inpatient renal dialysis for patients with ESRD who were admitted as
21 hospital inpatients were permitted to bill Medicare for those services using CPT Code 90935 or
22 90937, as appropriate, instead of CPT Codes 90918 through 90925.
23 9.       At all times material to this action, physicians who performed medical care for a
24 hospital inpatient subsequent to the initial patient visit were permitted to bill Medicare for those
25 services using either one of three CPT Codes, 99231, 99232, or 99233, as appropriate, depending on
26 the level of complexity involved and the amount of time spent with the patient.  The Medicare

1  Carriers Manual issued by CMS prohibited physicians from billing for both CPT Code 90935 or
2  90937, and CPT Code 99231, 99232, or 99233, on the same day for the same patient.

3  10.     At all times material to this action, physicians who performed an initial consultation
4  for a treating physician regarding the treating physician's hospital inpatient were permitted to bill
5  Medicare for those services using one of five CPT Codes, 99251 through 99255, as appropriate
6  depending on the level of complexity involved and the amount of time spent with the patient.

7  11.     University Medical Center (UMC) was not a facility certified by Medicare to perform
8  outpatient dialysis services for Medicare beneficiaries during the relevant time period.

9  12.     Dr. Cyril Ovuworie graduated from the University of Lagos' School of Medicine in
10 1991 and did his internship in Nigeria.  In 1994, he came to New York and did a 3-year residency in
11 internal medicine at Harlem Hospital, finishing in 1997.  He then completed a 2-year Nephrology
12 Fellowship at John Hopkins University in Baltimore in 1999 and in 2000, completed a Fellowship
13 in Transplant Nephrology at Harvard Medical School in Boston.

14 13.     He has participated in numerous research projects in Cholesterol, Homocysteine and
15 Heart Disease and published in several medical journals.

16 14.     From September 2000 to August 2001 he served as an attending Nephrologist at
17 Kaiser Permanente's Los Angeles Medical Center and was also Clinical Instructor at the University
18 of California's School of Medicine in Los Angeles from July to August 2001.  Dr. Ovuworie is
19 admitted to several hospitals in the Las Vegas area, namely: UMC Valley Hospital, Desert Springs,
20 St. Rose Hospitals, Sienna and De Lima, Mountain View, Summerlin Hospital, Centinela, Southern
21 Hills Hospital and Spring Valley Hospital.

22 15.     Dr. Ovuworie is board certified in both Internal Medicine (1998) and Nephrology
23 (2000) and obtained his Medical License for the State of Nevada in February 2001.

24 16.     At all times relevant to this lawsuit, University Medical Center (UMC) was faced
25 with a medical dilemma.  There were two patients, Kathryn Hooker (Hooker) and Dorian Richmond
26 (Richmond) who were in end stage renal failure or chronic renal failure, with the medical complica-

1  tions appertaining thereto, who had no insurance, were noncompliant, unstable, violent or nasty to
2  treating medical personnel and who had been blackballed or refused treatment at all ten certified
3  outpatient centers (which were owned by two companies) in the area.
4  17.	Most of the practitioners affiliated with UMC were the very same physicians who
5  had refused to treat Hooker and Richmond at the outpatient facilities with which they were also
6  affiliated.  These physicians also refused to treat Hooker and Richmond at UMC.
7  18.	As a result of the foregoing difficulties, on or about September 2000, UMC
8  contracted with Total Renal Care, Inc., d.b.a. Las Vegas Acute Dialysis to provide dialysis to its
9  patients. However, UMC did not have a certified outpatient dialysis center.  Medicare would only
10 authorize treatment for inpatients, but the staff doctors at UMC still refused to treat these particular
11 patients. Between October 2001 and January 2002, Dr. Ovuworie was recruited by UMC to provide
12 medical care for these noncompliant patients, such a Hooker and Richmond, whom no other
13 nephrologist in Las Vegas was willing to care for and no Medicare certified outpatient dialysis
14 centers would allow in.
15 19.	UMC approached Dr. Ovuworie, a new nephrologist to the Las Vegas area, who was
16 willing to treat these patients whom all other doctors refused to treat, to solve its crisis. On
17 numerous occasions, between 2002-2004, Dr. Ovuworie provided dialysis services for patients
18 Hooker and Richmond for which he never billed Medicare.  On other occasions he billed Medicare
19 for Hooker and Richmond's care as inpatients.
20 20.	During all relevant times in the complaint, UMC provided acute dialysis services for
21 acute renal failure and ESRD (End Stage Renal Failure) patients and operated under a policy
22 entitled "Renal Dialysis Suite Functional Program" for admitted patients only.
23 21.	Based on the UMC hospital protocol, patients admitted under the Renal Dialysis
24 Suite Functional Program were triaged, labs drawn and patients were admitted only if their medical
25 conditions necessitated required such admission to the hospital.
26 . . . .

22. Richmond and Hooker were among of a number of patients who were considered noncompliant and kicked out of all Medicare approved and contracted freestanding outpatient dialysis centers operating in the Las Vegas area and therefore were forced to present themselves at the Emergency Room at UMC for dialysis.

23. In addition to documented End Stage Renal Disease, Hooker and Richmond were afflicted with significant co-morbidities such as diabetes, mellitus, uncontrolled severe hypertension, substance abuse and depression.

24. In each case when Hooker and Richmond presented to the Emergency Room at UMC, they were triaged and evaluated by laboratory test such a serum, creatinine, electrolyties as well as by the Emergency Room physician.

25. During all times relevant, when Hooker and Richmond presented themselves at UMC Emergency Room for treatment and were admitted, these patients were critically ill and presented complexities recognized in CPT codes 99233 and 99255.

26. The procedure for the hemodialysis of Hooker and Richmond, at UMC, an acute hospital setting does not lend itself to being termed routine, as this in-hospital dialysis, required, in most instances, one on one treatment by a skilled dialysis nurse in attendance during the entire treatment, with supervision by an attending nephrologist.

27. Hooker and Richmond's survival for the period relevant to the Complaint there had to be the high level of competent and complex care consistent with and reflective in CPT Codes 99233 and 99255.

28. During the time relevant to the Complaint, UMC was not a Medicare approved outpatient provider of dialysis services for End Stage Renal Disease pursuant to the CMS guide-lines.

29. Pursuant to the Medicare Carriers Manual §§ 2230.5A, 2230. 5B, and 4272, Defendants could not justify the use of CPT Code 90921, Monthly Capitation Payment as the provider of physician services to patients Hooker and Richmond, therefore he had to bill for his

1 dialysis services pursuant to CPT Code 90935.

2 30. For Dr. Ovuworie to appropriately bill Medicare using CPT Code 90921 Monthly
3 Capitation Payment, as Plaintiff claims he should have, he would have had to include element 21 of
4 the CMS 1500 claim form, the name and address of the outpatient facility providing the dialysis
5 services. Patients Hooker and Richmond were barred from using any Medicare approved outpatient
6 centers in the Las Vegas area, therefore they had no choice but to dialyze at UMC which was not a
7 facility certified by Medicare to perform outpatient dialysis.

8 31. Under the totality of evidence presented, UMC officials informed Dr. Ovuwarie that
9 they were treating Hooker and Richmond as inpatients and directed Dr. Ovuworie to bill the patients
10 as inpatients, thus he reasonably believed that during all times relevant Hooker and Richmond were
11 UMC inpatients pursuant to CPT code 90935 and were appropriately billed.

12 32. Pursuant to Medicare guidelines and regulations, Defendant Ovuworie could not bill
13 as outpatient hemodialysis services provided for patients Hooker and Richmond between 2002 and
14 2004 at UMC.

15 33. Defendant Ovuworie reasonably relied on information provided to him by UMC that
16 the patients who were admitted to UMC for dialysis through the Emergency Room were to be
17 treated as inpatients, notwithstanding Plaintiff's insistence that a 23-hour admission could not be
18 characterized as an admission. Admission and discharge procedures were followed which justify
19 and confirm both UMC and Dr. Ovuworie's characterization of the inpatient status.

20 34. Dr. Ovuworie and the UMC Clinical Manager of the Dialysis Unit sought guidance
21 and instruction from Medicare concerning the appropriate billing procedure for treatment of
22 noncompliant patients admitted by UMC for dialysis. On one occasion, Medicare advised Dr.
23 Ovuworie to bill only for hemodialysis and to suspend billing for consultation since the
24 noncompliant patients were coming frequently to UMC's Emergency Room. After receiving that
25 advice, Defendants stopped billing for consultations on Hooker and Richmond.
26 . . . .

35. Dr. Ovuworie had not entered into private practice before coming to Las Vegas in 2001. The situation with Hooker and Richmond was unusual to both UMC and Medicare with no regulations, directions, guidelines or experience available which dealt with this unusual situation, particularly of a high maintenance patient being refused treatment by a qualified outpatient center. There were no forms for this situation. The hospital spoke to Leslie LNU, a medicare inspector, who said that Medicare did not care how they dealt with the patients, so long as the patients got treatment. Dr. Ovuworie sought and received direction from UMC as to how he should bill Medicare for his services. Furthermore, he was told and reasonably believed that the term or phrase, "Admit for 23 hour observation" meant the patients were "inpatients." He did not bill for any services not rendered.

36. Plaintiff's witnesses' claim that he should have billed under 90921, rather than 90935, and then when denied he could appeal is not reasonable, given that it was impossible to prepare a complete bill–giving grounds for its rejection–and no provisions in the guidelines or regulations for exceptions for submitting an incomplete form. The alternative of inserting nonexistent codes for an uncertified outpatient facility would have required the Dr. Ovuworie to knowingly commit fraud. Plaintiff's suggestion or argument that the doctor could have performed the medical services for free is too absurd to justify comment.

37. UMC was obligated to provide services to the indigent and were providing inpatient services, not outpatient services. UMC billed for inpatient services using the same "inpatient" codes as Dr. Ovuwarie. Although UMC may have been wrong or confused about how the patients should be treated or its services billed, that is not evidence that either UMC or the Defendants here knowingly violated the False Claims Act (FCA) 31 U.S.C. §3729 *et seq.* or acted with deliberate ignorance or reckless disregard of the truth of the billings to Medicare for services provided to patients Hooker and Richmond.

38. If any Finding of Fact is considered to be a Conclusion of Law, or any Conclusion of Law is considered to be a Finding of Fact, it is the Court's intention that it be so considered.

CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject-matter of this action under 31 U.S.C. §3532(a) and 28 U.S.C. §1345. The Court has personal jurisdiction over Defendants because they conduct business in the District of Nevada, the relevant acts were performed in the District of Nevada and there was no challenge to the Court's jurisdiction.

2. Under the False Claims Act (FCA), 31 U.S.C. § 3729(a)(a), the Government has the burden of proving "(1) a false statement or fraudulent course of conduct, (2) made with scienter, that is 'knowingly,' (3) that was material, causing (4) the Government to pay out money or forfeit monies due." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006). The FCA defines "knowingly" as follows:

> For the purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information–
> (1) has actual knowledge of the information;
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
> (3) acts in reckless disregard of the truth or falsity of the information,
> and no specific intent to defraud is required.

31 U.S.C. §3729(b).

3. Defendants admitted that they submitted claims to Medicare and were paid, so only the elements of falsity, scienter, and materiality under the FCA are contested.

4. Plaintiff contends that Defendants submission of false claims was "knowingly" under the False Claims Act because he acted with deliberate ignorance and reckless disregard. A defendant who has "reason to know" that a claim was false but did not know, cannot be found liable under the amended Act unless this failure to know was deliberate or reckless. Furthermore, "reason to know" requires a person to draw reasonable inferences from information known; it does not create a duty of inquiry.

5. "The weakest account of the [False Claims] Act's 'requisite intent' is the 'knowing presentation of what is known to be false.' The phrase 'known to be false' in that sentence does not mean 'scientifically untrue,' it means 'a lie.' The Act is concerned with ferreting out 'wrongdoing,'

9

not scientific errors." *Wang v. FMC Corp.* F.2d 1412, 1421 (9th Cir. 1992). The Court questions whether Plaintiff's claim, that the billing was contrary to the regulations and guidelines, is correct, but assuming it is, Defendants cannot be liable under the Act for mere mistake or negligence. *Cf. United States ex rel. Oliver v. Parsons Co.,* 195 F.3d 457, 464-65 (9th Cir. 1999).

6.      Having failed to show, by a preponderance of the evidence, that Defendants, or any of them, knowingly violated the False Claims Act (FCA) 31 U.S.C. §3729 *et seq.* or acted with deliberate ignorance or reckless disregard of the truth regarding the billings to Medicare for services provided to patients Hooker and Richmond at UMC, Plaintiff has failed to meets its burden of proof and judgment must be against Plaintiff and in favor of Defendants.

7.      If any Finding of Fact is considered to be a Conclusion of Law, or any Conclusion of Law is considered to be a Finding of Fact, it is the Court's intention that it be so considered.

**JUDGMENT**

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is entered in favor of Defendants and against Plaintiff and that Plaintiff take nothing by way of its Complaint.

Dated: February 27, 2007.

_____
Roger L. Hunt
Chief United States District Judge